**UNITED STATES of America,**
**Appellee,**

v.

**Witold PLUTA, Defendant–Appellant.**

**Docket No. 98–1443.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 17, 1999.

Decided April 28, 1999.

John–Claude Charbonneau, Assistant United States Attorney, Burlington, Vermont (Charles R. Tetzlaff, United States Attorney for the District of Vermont, David V. Kirby, Chief, Criminal Division,

Burlington, Vermont, on the brief), for Appellee.

Thomas A. Zonay, Rutland, Vermont (Timothy U. Martin, Pratt Vreeland Kennelly & Zonay, Rutland, Vermont, on the brief), for Defendant–Appellant.

Before: KEARSE and SACK, Circuit Judges, and McAVOY, Chief District Judge *.

KEARSE, Circuit Judge:

Defendant Witold Pluta appeals from a judgment entered in the United States District Court for the District of Vermont, convicting him, following a jury trial, on two counts of smuggling aliens into the United States, in violation of 8 U.S.C. § 1324(a)(1)(A), and one count of conspiring to do so, in violation of 18 U.S.C. § 371, and sentencing him principally to eight months' imprisonment. On appeal, Pluta contends that the trial court erred in admitting in evidence the statements and Polish passports of the persons he was accused of smuggling; he also contends that the interpreters who served at his trial were not properly sworn. Finding no basis for reversal, we affirm.

## I. BACKGROUND

The present prosecution began after Pluta, a permanent resident alien of the United States, was detained by customs and immigration officials when he attempted, in suspicious circumstances, to reenter the United States from Canada. The government's evidence at trial consisted principally of testimony from government agents and from cooperating codefendant Ireneusz Migas. Taken in the light most favorable to the government, the evidence at trial revealed the following.

In late June 1991, Pluta, who lived in New York City, telephoned his friend Migas, who lived in Montreal, Canada, stating that two Polish women wished to enter

the United States. Migas informed Pluta that it would be difficult for the women to obtain visas from the American consulate in Montreal. Pluta asked whether Migas knew of someone who could arrange for the women to enter the United States "without having the visa," i.e., "illegally." (Trial Transcript, March 24, 1992 ("March 24 Tr."), 56.) Migas responded that he did not know of such a person, but he suggested that the women could cross the border into the United States through the woods near a hiking trail called the "Long Trail," which could be approached from the Canadian side of the border and which connected with Highway 105 near Richford, Vermont.

A few days later, Migas met one of the women, Anna Wicijewska, at the Montreal airport after Pluta provided him with her name, description, and flight information. Migas took Wicijewska to the American consulate in Montreal to request a visa for entry into the United States; officials there informed her that a decision would not be made for at least three weeks. Pluta and his friend Andrzej Gawlik drove from New York City to Migas's apartment in Montreal, arriving that night.

On the following day, June 29, 1991, Pluta, Gawlik, and Migas went to the bus station in Montreal to meet and take to Migas's home the second woman, Katarzyha Dyblik, arriving from Toronto. The group decided not to wait the three-week period needed for the women to seek visas authorizing their entry into the United States. On June 30, they placed the women's luggage in the back of Pluta's car; Migas, in his own car, drove the women, with Pluta and Gawlik following in Pluta's car, to the Long Trail near the United States border. Migas, who was paid a total of $1,950 by Pluta and Dyblik, then led the women on foot across the border and left them in a parking lot near High-

---

* Honorable Thomas J. McAvoy, of the United States District Court for the Northern District of New York, sitting by designation.

way 105 in Vermont. Gawlik drove Migas's car into a nearby Canadian town, where Migas could retrieve it later; Pluta and Gawlik then attempted to drive into the United States at Richford, Vermont.

When Pluta and Gawlik presented themselves at the Richford port of entry, a United States Customs Service inspector, noting the large quantity of luggage in the hatchback car, became suspicious when Pluta said he had entered Canada only a "couple of days" earlier and had acquired nothing during his stay. The inspector ordered a "secondary inspection," during which the luggage was searched by United States Immigration and Naturalization Service ("INS") Inspector James E. McMillan. McMillan found that the bags contained women's clothing and personal effects, as well as a number of documents bearing the names Anna Wicijewska and Katarzyha Dyblik, including what appeared to be Polish passports in their names. McMillan thereupon alerted United States border patrol agents to be on the lookout for two Polish women who might be attempting illegal entry.

In the meantime, Migas, after leaving Wicijewska and Dyblik, walked into Richford, hoping to get a ride back to Canada. In Richford he was stopped by United States Border Patrol Agent James Backhaus, who had received word of the alert issued by McMillan. Migas, after being questioned, led Backhaus to the women, who were found hiding in the brush near the parking lot in which Migas had left them. Backhaus asked the women who they were. They identified themselves as Anna Wicijewska and Katarzyha Dyblik; each stated that she was a Polish citizen.

To the extent pertinent here, Pluta, Migas, and Gawlik were indicted on two counts of smuggling aliens into the United States, in violation of 8 U.S.C. § 1324(a)(1)(A) and 18 U.S.C. § 2, and one count of conspiring to do so, in violation of 18 U.S.C. § 371. Migas and Gawlik entered into plea agreements and testified against Pluta. Following a jury trial in 1992, Pluta was found guilty on those three counts. Pluta failed to appear for sentencing and remained a fugitive for some six years; he finally surrendered in 1998 and was sentenced principally to eight months' imprisonment. This appeal followed.

## II. DISCUSSION

On appeal, Pluta contends that he is entitled to a new trial on the grounds that the district court erred in allowing the government to introduce in evidence the statements and passports of Wicijewska and Dyblik as to their citizenship, and that the court failed to administer proper oaths to the interpreters who served at trial. Given the record in this case, these contentions provide no basis for reversal.

### A. The Issue as to Alienage

#### 1. The Statements of Wicijewska and Dyblik

Pluta's principal substantive contention is that the district court erred in receiving hearsay evidence as to the citizenship of Wicijewska and Dyblik. He states that

> [a]t trial the government had the burden of proving that the two women were aliens. There were no witnesses called by the government who had actual knowledge of the women's citizenship. Rather, the only source of that evidence at trial was the women's statements made to third parties and their passports.

(Pluta brief on appeal at 19.) He argues that "[i]n allowing the government to introduce the hearsay statements" of Wicijewska and Dyblik, the district court erred because the government did not establish, as required by Fed.R.Evid. 804(b)(4), that the women were unavailable to testify. (Pluta brief on appeal at 19.) We find in this argument no basis for reversal.

We begin by noting that the principal premise of Pluta's argument, i.e., that as to the status of Wicijewska and Dyblik as aliens "the only source of . . . evidence at

trial was the women's statements made to third parties and their passports," is squarely contradicted by the record. At trial, Migas testified to his initial June 1991 conversation with Pluta, in which Pluta himself stated that the women were Polish. Migas began:

> [H]e told me that his friend [*sic*] have problem [*sic*] concerning their relatives. In one case this was the wife of his friend, and the other case was the niece of his friend. And the problem was that they were—they wanted to enter the United States.

(March 24 Tr. 53–54.) Although at this point Pluta's counsel initially interposed a hearsay objection, she quickly withdrew it, recognizing that Pluta's own out-of-court statements offered against him are, by definition, not hearsay, *see* Fed.R.Evid. 801(d)(2)(A) ("A statement is not hearsay if" it is a "party's own statement" "offered against [that] party"). Migas continued his description of Pluta's statements as follows:

> And so he—he wanted somehow—or asked me if I know any way for them to enter the United States, because they will be in Canada or come into Canada, so the question was how to go about coming from Canada to the United States, *being a Polish citizen* without the visa to enter to the United States.

(March 24 Tr. 54 (emphasis added).) Whether or not Pluta himself had actual, first-hand knowledge of the women's Polish citizenship, his statement to Migas was evidence of that citizenship.

Further, the record established beyond cavil that the two Polish women Pluta discussed with Migas were Wicijewska and Dyblik. Migas testified that in that first conversation, Pluta told him one of the women would be arriving by airplane in a few days and asked him to accommodate her at Migas's home until she could enter the United States. In the same conversation, Pluta said the second woman would be arriving later from Toronto. In a subsequent conversation, Pluta gave Migas Wicijewska's name, description, and arrival information, and asked Migas to meet Wicijewska's "plane which was coming from Poland." (March 24 Tr. 57–58.) Migas proceeded to meet Wicijewska at the airport, take her home with him, and take her to the American Consulate to apply for a United States visa. Dyblik arrived a day later from Toronto and was met by Migas, Gawlik, and Pluta. When Migas was shown at trial photographs that Backhaus had taken of Wicijewska and Dyblik following their arrests, Migas identified the women in the pictures, without objection, as the women he had met in Montreal, taken into his home, and accompanied across the border into the United States at the behest of Pluta while Pluta transported their luggage.

There thus could be no genuine question that the two women smuggled into the United States by Migas in collaboration with Pluta were Wicijewska and Dyblik, whom Pluta himself had described as Polish citizens.

Pluta's contention, apparently, is that the district court erred in allowing Backhaus to testify that when he found Wicijewska and Dyblik hiding in the brush and inquired as to their citizenship, the women themselves stated that they were Polish citizens. Rule 804 of the Federal Rules of Evidence provides that statements "concerning the declarant's own birth, adoption, marriage, divorce, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of personal or family history" are not excluded by the hearsay rule if the declarant is unavailable. Fed.R.Evid. 804(b)(4)(A). Pluta apparently does not contend that one's citizenship is not such a fact but argues that the government did not show that the women were unavailable. A declarant may be considered "unavailable" within the meaning of Rule 804, if, *inter alia*, the proponent of her statement has been unable to procure her attendance "by process or other reasonable means." Fed.R.Evid. 804(a)(5). *Cf. Ohio v. Roberts,* 448 U.S. 56, 74–75, 100

S.Ct. 2531, 65 L.Ed.2d 597 (1980) (witness is unavailable for Sixth Amendment Confrontation Clause purposes if the government shows that it made reasonable and good faith, but unsuccessful, efforts prior to trial to locate and produce the witness).

In the present case, the government's evidence as to the unavailability of Wicijewska and Dyblik, who by the time of Pluta's trial apparently had been ordered deported but were on parole in the custody of a person in Queens, New York, was thin and somewhat vague. When the issue of unavailability was raised on the second day of trial, March 25, 1992, the Assistant United States Attorney ("AUSA") stated that he had "issued" subpoenas for the women on March 20, but had not served them because "they asked if they could not be served personally, for various reasons...." (Trial Transcript, March 25, 1992 ("March 25 Tr."), 9.) The AUSA stated:

> We made arrangements for them to pick up subpoenas at the United States Marshal Service in Queens, New York, and to obtain travel advances. The ladies did not appear, as we determined yesterday, or late yesterday afternoon, when we left court, and we asked the Marshal Service in Queens to go out and personally serve the women. We have not been able to determine at this time this morning that they have been able to locate them and personally serve them.
> .... We do not—we have not heard back yet from the Marshal Service whether they have physically located those people to mete [sic] service upon them.
> They are not present here today. We have not heard from them. They are not, as we speak now, in the courtroom. .... [A]s it stands right now, the government has done everything it can to secure the presence of those people, but they are not here. They are unavailable.
> We have issued legal process to obtain their presence and made ever[y] reasonable effort to get them here. We know that they have personal knowledge these subpoenas exist. However, we also at this stage—the information that we have concretely is they have not been personally served with those as of yet.

(March 25 Tr. 9–10.) The government's own view that its efforts were reasonable was not, of course, dispositive, and the district judge did not conclusively rule that the efforts described by the government were sufficiently reasonable, as a general matter, to make the women unavailable within the meaning of Rule 804. Instead, he ruled that he would not exclude Backhaus's testimony as to the women's statements of their own names and citizenship in light of the testimony already in evidence as to those facts.

■ We too decline to determine whether the evidence showed a government effort that was reasonable. In accordance with a February 20, 1992 scheduling order, the two-day trial began on Tuesday, March 24. At the start of trial, the AUSA estimated that presentation of the government's case would require only half a day and informed the court that Wicijewska and Dyblik were "under subpoena." (March 24 Tr. 4). According to the AUSA's statements the next day, however, the government did not "issue" the subpoenas until the Friday before trial; it did not serve them at all; and it did not learn that the women had not picked up the subpoenas until after the end of the first day of trial. Whether there was a reasonable explanation for the government's decision to accommodate the women's reported desire not to be served and whether it was reasonable for the government to enter into the reported arrangements on the eve of trial, with no apparent assurance that the witnesses would voluntarily pick up the subpoenas and with no timely alternative arrangements in case they did not, is hardly clear from this record. Nonetheless, in light of Migas's testimony as to the women's identities and Pluta's statements as to their Polish citizenship, testimony that

was, without objection, already in the record, the court's admission of Backhaus's hearsay testimony recounting the statements of the women themselves as to their identities and Polish citizenship, if error, was certainly harmless.

### 2. *The Passports*

Pluta also argues that the contents of the Polish passports found in the women's luggage, identifying Wicijewska and Dyblik as Polish citizens, should have been excluded from evidence both because those contents were hearsay and because the passports were not properly authenticated pursuant to Fed.R.Evid. 902(3) and 18 U.S.C. § 3505. We conclude that these provisions were not controlling and that if there was any error in the court's receipt of the passports, it too was harmless.

Pluta's reliance on § 3505 is misplaced because, *inter alia,* that section deals with business records. *See, e.g.,* 18 U.S.C. § 3505(a)(1)(B) ("foreign record[s] of regularly conducted activity" that were "kept in the course of a regularly conducted business activity"); H. Rep. No. 98–907, at 3, *reprinted in* 1984 U.S.C.C.A.N. 3578, 3580 (purpose of § 3505 is to create "a simple, inexpensive substitute for the cumbersome and expensive procedures presently required for the admission of foreign business records"). Passports *qua* passports are more properly characterized as public records than business records, *see generally* 31 M. Graham, *Federal Practice and Procedure* § 6759, at 404 n. 2 (interim ed.1997) ("[p]ublic records and reports of foreign governments," including "passport records," are within scope of Rule 803(8)). *Cf. United States v. Doyle,* 130 F.3d 523, 546–47 (2d Cir.1997) (distinguishing between foundation requirements for a business record under § 3505 or Fed.R.Evid. 803(6) and those for a public record under Fed.R.Evid. 803(8)).

In order to be admissible, physical evidence must, of course, be properly authenticated. *See* Fed.R.Evid. 901(a);

*United States v. Maldonado–Rivera,* 922 F.2d 934, 957 (2d Cir.1990), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). The authentication prerequisite simply requires the proponent to submit "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). This requirement is satisfied " 'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.' " *United States v. Ruggiero,* 928 F.2d 1289, 1303 (2d Cir.) (quoting 5 J. Weinstein & M. Berger, *Weinstein's Evidence* § 901(a)[01] (1990)), *cert. denied,* 502 U.S. 938, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991). "[T]he burden of authentication does not require the proponent of the evidence to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be. Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *United States v. Holmquist,* 36 F.3d 154, 168 (1st Cir.1994), *cert. denied,* 514 U.S. 1084, 115 S.Ct. 1797, 131 L.Ed.2d 724 (1995). The trial court has broad discretion to determine whether a document has been properly authenticated, and we review its ruling only for abuse of discretion. *See, e.g., United States v. Maldonado–Rivera,* 922 F.2d at 957; *United States v. Ruggiero,* 928 F.2d at 1303.

Rule 902 provides that certain types of documents are self-authenticating, *i.e.,* they do not require any extrinsic evidence for authentication. A foreign public document that purports to be executed by an official empowered to execute it is self-authenticating if it is accompanied by an appropriate certification of genuineness made by a diplomatic or consular official of the United States or the foreign country. *See* Fed.R.Evid. 902(3); *United States v. Doyle,* 130 F.3d at 545. A document which is of a type that could be self-authenticating but which does not meet all the requirements of Rule 902 may nonetheless be authenticated by any means appropri-

ate under Rule 901. *See, e.g., United States v. Childs,* 5 F.3d 1328, 1336 (9th Cir.1993), *cert. denied,* 511 U.S. 1011, 114 S.Ct. 1385, 128 L.Ed.2d 60 (1994); 5 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 902.02[1] (1997).

■ Pluta's contention that the passports were not properly authenticated *qua* passports under Rule 902(3) is wide of the mark for two reasons. First, the fact that documents in the names of Wicijewska and Dyblik were found in the luggage transported by Pluta was admissible simply to show that Pluta had a connection with the women whom Backhaus found hiding in the bushes. In this respect, neither the nature of the documents as passports nor the truth of their contents was material; regardless of whether the women's names really were Wicijewska and Dyblik, a connection between Pluta and the women was shown by the fact that the names that appeared on the documents were the same as the names the women used. For the purpose of establishing that connection, the only authentication that was required was testimony by McMillan establishing that these were the documents that he had found while searching the luggage carried by Pluta.

Second, although the passports were also offered *qua* passports to show that Wicijewska and Dyblik were Polish citizens, the fact that the passports were not accompanied by official certifications, and hence were not self-authenticating under Rule 902(3), is not dispositive because the record shows that the court indicated that the passports would be admissible under Rule 901. Thus, when the first of the passports was offered in evidence during the testimony of McMillan, the court stated that the passport was "a reliable source of information, which ... if not self-authenticating, can be authenticated by this witness." (March 24 Tr. 118.)

As to authentication under Rule 901, there may be some question as to whether McMillan's testimony sufficed. McMillan testified with respect to, *inter alia,* his training as an INS supervisory inspector, his familiarity with immigration law and procedures, his extensive experience "conduct[ing] inspections to determine admissibility for [*sic*] excludability into the United States" (March 24 Tr. 110), and his recognition of the documents as official passports issued by Poland. The reason he gave for that recognition, however, seems superficial:

Q Now, based on your training, knowledge and experience in this area, do you know what those documents are?

A They're Polish passports.

Q And how do you know that, sir?

A They're identified as such right on the document.

(March 24 Tr. 120.)

Q Based upon your training and expertise in this area, sir, what citizenship do those passports establish?

A Polish citizenship.

Q How do you know that, sir?

A It's identified as such on the passport.

(March 24 Tr. 121.) Thus, while McMillan's qualifications appear to be adequate, his answer to the last question in each series seems arguably to reflect only his ability to read.

■ We have less hesitation in rejecting Pluta's contention that, even if the passports were properly authenticated, their contents stating that Wicijewska and Dyblik were citizens of Poland were inadmissible hearsay. Except in certain circumstances not present here, the hearsay rule, regardless of the declarant's availability, does not exclude "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... matters observed pursuant to duty imposed by law as to which matters there was a duty to report." Fed.R.Evid. 803(8). *Cf. United States v. Eltayib,* 88 F.3d 157, 169 (2d Cir.) (passports of nine defendants admissible to show that all nine entered Venezuela on same date), *cert. denied,* 519

U.S. 1045, 117 S.Ct. 619, 136 L.Ed.2d 543 (1996); *United States v. Brown*, 770 F.2d 768, 771 (9th Cir.) (in prosecution for narcotics smuggling, passports showing international travel carried "circumstantial guarantees of trustworthiness" within meaning of former Fed.R.Evid. 803(24) (the "residual exception" now in Fed. R.Evid. 807)), *cert. denied*, 474 U.S. 1036, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985). Although a United States passport may not be admissible in a United States court to prove United States citizenship, *see, e.g., Urtetiqui v. D'Arcy*, 34 U.S. 692, 699, 9 Pet. 692, 9 L.Ed. 276 (1835); *Peignand v. INS*, 440 F.2d 757, 760 (1st Cir.1971), inasmuch as a passport is, "in a sense, a letter of introduction in which the issuing sovereign vouches for the bearer and requests other sovereigns to aid the bearer," *Haig v. Agee*, 453 U.S. 280, 292, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981), a foreign passport may be admissible in a United States court to prove foreign citizenship.

■ We need not resolve this question, however, for even if the passports of Wicijewska and Dyblik were not properly admitted to show their Polish citizenship, either for lack of authentication or for some other reason, we would conclude that any error in their admission was entirely harmless given the record in this case. As discussed above, Pluta himself had described Wicijewska and Dyblik to Migas as citizens of Poland. Further, for purposes of 8 U.S.C. § 1324(a)(1)(A)'s prohibition against the smuggling of aliens, an "alien" is defined simply as "any person not a citizen or a national of the United States." 8 U.S.C. § 1101. Migas's testimony as to Pluta's statements, the attempts of the two women to obtain United States visas (*see, e.g.,* March 24 Tr. 80 ("They applied [for visas] before in Poland and they didn't get.")), and the ultimate decision to have them enter the United States surreptitiously because they lacked visas, was ample to permit the inference that, whether or not the women were citizens of Poland,

they surely were not citizens or nationals of the United States.

**B.** *The Interpreters*

■ Finally, Pluta contends that he should have a new trial because the district court failed to administer oaths or affirmations, as required by the Federal Rules of Evidence, to the persons who were to serve as interpreters at his trial. Because Pluta did not make this objection at trial, his present challenge is reviewable only for plain error, *see* Fed.R.Crim.P. 52, *i.e.*, it must have constituted an error that was "clear" or "obvious," and "affect[ed] his] substantial rights," *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted). We see no such error here.

■ Rule 604 of the Federal Rules of Evidence provides that "[a]n interpreter is subject to the provisions of these rules relating to ... the administration of an oath or affirmation to make a true translation." Fed.R.Evid. 604. As to oaths and affirmations, the Rules provide that

> [b]efore testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so.

Fed.R.Evid. 603. In the present case, the district court appointed two Polish–English interpreters to translate the proceedings, one for Pluta and one for certain other witnesses. Prior to jury selection, the district court questioned the interpreters as follows:

> THE COURT:.... There is an interpreter who is interpreting these proceedings for Mr. Pluta. Mr. Stanislaus Staron?
>
> THE INTERPRETER: Yes, sir.
>
> THE COURT: Mr. Staron, you will literally interpret all of these proceedings for the defendant?

THE INTERPRETER: Yes, your Honor.

THE COURT: And Anna Elmore is another interpreter who will assist us with testimony of witnesses. And at such time as that comes up, Miss Elmore, you will do literal interpretation for the witness?

THE INTERPRETER: Yes, I will.

(March 24 Tr. 11–12.)

Although this colloquy may have been somewhat less than what is envisioned by the Rules' requirement of a dialogue sufficient to "awaken the [interpreter's] conscience and impress the [interpreter's] mind" with his or her duties, we conclude that Pluta has not shown that any shortfall caused him prejudice. Nor has he called to our attention any respect in which he contends that the interpreters failed to interpret literally or accurately. Accordingly, we see no effect on Pluta's substantial rights, and hence no plain error.

## CONCLUSION

We have considered all of Pluta's contentions on this appeal and have found in them no basis for reversal. The judgment of the district court is affirmed.