781 A.2d 77 (2001)
344 N.J. Super. 198
Vijaya KALOLA, Plaintiff,
v.
Lawrence EISENBERG, Defendant.
Superior Court of New Jersey, Law Division, Mercer County.
Decided June 13, 2001.
*78 Gregory Gogo, Trenton, for Plaintiff Vijaya Kalola.
Hoagland, Longo, Moran, Dunst & Doukas, LLP, for Defendant Lawrence Eisenberg Michael F. Dolan, New Brunswick, appearing.
SABATINO, J.S.C.
In this dental malpractice case, defense counsel moved in limine to exclude proof of allegedly threatening telephone calls. The calls were supposedly placed to a subsequent treating dentist after he had examined the plaintiff following her course of dental treatment with the defendant. The application for exclusion raises evidentiary issues of authentication under N.J.R.E. 901, the hearsay exception for party-opponent admissions under N.J.R.E.803(b)(1), and competing considerations of undue prejudice and relevancy under N.J.R.E. 403. This court denies the defendant's application and will permit the plaintiff to offer proof of the alleged telephone conversations.
Plaintiff Vijaya Kalola was a patient of defendant Lawrence R. Eisenberg, D.M.D., from March 1997 through August *79 1997. During that time through the present, defendant practiced dentistry in Princeton and Freehold, in a professional corporation with his brothers, Adam G. Eisenberg, D.D.S. and Matthew C. Eisenberg, D.M.D. Without dispute, the treatment plaintiff received in the Eisenberg dental offices, which she alleges to constitute malpractice, was provided exclusively by defendant Lawrence Eisenberg; the plaintiff received no unsatisfactory professional care from either of that defendant's brothers.[1]
On May 5 and 12, 1997 Dr. Lawrence Eisenberg placed a steel post and porcelain crown on plaintiff's tooth # 19, the mandibular left first molar. Plaintiff then began to suffer discomfort, swelling and other complications in her gums around the newly-crowned tooth. After several follow-up visits with Dr. Eisenberg in the summer of 1997, plaintiff discontinued treatment with him following her last appointment on August 11, 1997.
On May 12, 1998 plaintiff was first examined by another dentist, Bharat Vohra, D.D.S., of Montgomery. Dr. Vohra detected what he considered problems with plaintiff's crown on tooth # 19. Among the problems that Dr. Vohra identified was a gap underneath the crown and above the surface of the underlying tooth; a gap that, under plaintiff's theory of liability, can be described in the dental vernacular as an "open margin," where bacteria and food particles will collect and lead to decay. At the end of that visit on May 12, 1998, Dr. Vohra recommended that plaintiff go back to Dr. Eisenberg to have the crown removed and refitted or replaced. Plaintiff telephoned Dr. Eisenberg's office later that same day concerning Dr. Vohra's findings. She requested that Dr. Eisenberg forward her dental x-rays to Dr. Vohra. That request was later confirmed in a patient authorization form from Dr. Vohra dated May 26, 1998, signed by the plaintiff.
Thereafter, Dr. Eisenberg wrote plaintiff a letter on June 22, 1998, which said:
Dear Mrs. Kalola,
As per our conversation on June 22, 1998, please schedule an appointment so that I may examine tooth #19.
At this time I will fabricate a new crown if necessary.
Thank you.
/s/ Lawrence R. Eisenberg, D.M.D.
However, plaintiff chose not to return to Dr. Eisenberg. She continued to treat with Dr. Vohra through the end of calendar year 1998 for general dental work and also saw a periodontist, Laurence Chacker, D.M.D., for her problems with tooth # 19. After considering her treatment options, plaintiff elected to have the crown removed by Dr. Vohra in November 1998. Tooth # 19 itself was extracted in April 1999.
The present motion to bar evidence arises out of telephone calls allegedly placed to Dr. Vohra's office on some unspecified *80 date and time after June 3,1998 and before November 23, 1998. According to Dr. Vohra, the caller identified himself as "Dr. Eisenberg," and made reference by name to Mrs. Kalola and to the crown that the caller stated he had placed on her tooth. Dr. Vohra contends that in the course of that supposed conversation, the caller urged Dr. Vohra to "look at things differently", emphasizing to Dr. Vohra that he, the caller, had been in practice "for 25 years" and that he could "make things really difficult for you [Dr. Vohra]." Dr. Vohra recalls the caller then started using profane language, causing Dr. Vohra to hang up the phone. Shortly thereafter, Dr. Vohra's phone allegedly rang a second time. The second call was picked up by Dr. Vohra's office assistant, Nicole Rullo, who allegedly was told by the caller in a rude voice to "get him [Dr. Vohra] back on the phone." The assistant then hung up the phone, and later that day informed Dr. Vohra of the circumstances of the second call.
The defendant, through his counsel, strenuously denies ever placing the alleged telephone calls to Dr. Vohra. Moreover, at his deposition, Dr. Vohra conceded that he was not certain whether the caller with whom he spoke was indeed defendant Lawrence Eisenberg.
Given these circumstances, the defense moves to exclude the alleged telephone calls on three independent grounds. First, the defendant argues that conversation must be excluded because the identity of the caller cannot be authenticated in accordance with N.J.R.E. 901. Second, defendant argues that any statements attributed to the alleged caller are inadmissible hearsay barred by N.J.R.E. 802. Third, the defense argues that the probative value of the calls is substantially outweighed by the inflammatory prejudicial effect they would have on the jury. The court considers each of those objections in turn.
In order to evaluate these points, the court conducted a preliminary hearing on admissibility outside of the jury's presence, pursuant to N.J.R.E. 104. At that preliminary hearing Dr. Vohra, the recipient of the alleged telephone calls, testified in detail about the context and substance of the calls. The court also had the opportunity to assess Dr. Vohra's demeanor, in aid of finding whether a reasonable basis exists for the jury to find his account of the conversations in question credible. The court also heard testimony from Dr. Vohra's wife, Swati Vohra, who stated that her husband had told her later in the day about receiving the abusive telephone call. Mrs. Vohra also testified that she spoke that same day with her husband's assistant, Ms. Rullo, who conveyed to her the details of the second call. Finally, the court heard testimony from plaintiff, who indicated that Dr. Vohra had informed her of his receipt of the telephone calls at a subsequent visit in his office.
A. Authentication Under Evidence Rule 901
Rule of Evidence 901, first adopted in New Jersey in 1992 as part of this State's comprehensive revision of its evidence code, states as follows:
The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims.
This present version of New Jersey Rule 901 tracks the language of Federal Rule 901(a) verbatim. It differs from former New Jersey Evidence Rule 67, which had only addressed the authentication of writings. See 1991 Supreme Court Committee Comment to New Jersey Rules of Evidence, *81 reprinted in Biunno, New Jersey Rules of Evidence (2001 ed.) at 949.
The federal evidence rules contain ten specific illustrations of authentication, codified at Fed.R.Evid. 901(b)(1) through (10). According to our state drafters, however, those ten federal examples were not adopted in New Jersey, "because they are not exclusive nor is the proof set out in them necessarily sufficient in all cases." 1991 Committee Comment, reprinted in Biunno, supra, at 949. Nevertheless, the federal analogues may be instructive, if not binding, in this state.
In particular, the federal rules set forth a specific provision, Rule 901(b)(6), for the authentication of an outgoing telephone call.[2] That method, of course, is not directly on point here, since plaintiff is seeking to authenticate incoming calls made to Dr. Vohra.
In addition, the federal rules also expressly permit authentication via "distinctive characteristics and the like," including proof of the "contents" or "substance" of a communication. See Fed.R.Evid. 901(b)(4)(allowing authentication of a communication based upon "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances"). According to a leading treatise, "[t]he probative value of such evidence [based on authenticating proof of contents or substance] depends upon the relative obscurity of the subject matter since familiarity with a topic of common knowledge would not advance the task of identifying the author or speaker." G. Weissenberger, Federal Rules of Evidence: Rules, Legislative History, Commentary and Authority 641 (1999 ed.). As Professor Weissenberger observes, "[w]here the subject matter is not generally known and the purported author or speaker is shown to have had knowledge of its substance, there exists foundational evidence sufficient to support a finding that that person is the source of the item." Id. at 641-42.
Modern evidence scholars, moreover, have rejected Dean Wigmore's proposition that the contents/substance method of authentication can only be used where the subject matter discussed in the communication was known only to a unique person. See 5 Weinstein & Berger, Weinstein's Evidence ¶ 901(b)(4)[01], at 901-47 (disapproving Wigmore's view that mere contents will not suffice to authenticate unless only the author would know the details); C. Mueller & L. Kirkpatrick, Evidence 1127 (2d ed.1999)(finding Wigmore approach "unduly restrictive"); accord United States v. Mangan, 575 F.2d 32, 41-42 (2d Cir.1978)(rejecting Wigmore's narrow test as unsound).
As federal judges have recognized, Rule 901 "does not erect a particularly high hurdle." United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir.2001) (quoting United States v. Ortiz, 966 F.2d 707, 716 (1st Cir.1992)). The proponent of the evidence is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." United States *82 v. Dhinsa, 243 F.3d 635, 658 (2d Cir.2001) (quoting United States v. Pluta, 176 F.3d 43,49 (2d Cir.1999), cert. denied, 528 U.S. 906, 120 S.Ct. 248, 145 L.Ed.2d 208 (1999)). There need only be a prima facie showing to the court that the evidence is authentic. Once a prima facie case is made, the evidence goes to the jury members, "who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic." United States v. Reilly, 33 F.3d 1396, 1404 (3d Cir.1994) (holding that telegraphs were properly authenticated by witnesses who had identified their appearance and content, as well as by other circumstantial evidence). "The connection between a message (either oral or written) and its source may be established by circumstantial evidence," and the burden of proof is "slight." Id.
The requirement under Rule 901 is satisfied if sufficient proof has been introduced so that a reasonable juror could find that the matter in question is what its proponent claims. Reilly, 33F.3d at 1405. The trial court has broad discretion in determining whether an item of evidence has been properly authenticated, and the standard of review is abuse of discretion. Dhinsa, 243 F.3d at 658.
The notes to Federal Rule 901 indicate that the mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity; additional evidence, which "need not fall into any set pattern," could "furnish the necessary foundation." Fed. R.Evid. 901(b)(6) advisory committee notes. For example, "the authentication may be established by circumstantial evidence such as the similarity between what was discussed by the speakers and what each subsequently did." United States v. Puerta Restrepo, 814 F.2d 1236, 1239 (7th Cir.1987); see also United States v. Garrison, 168 F.3d 1089, 1092-93 (8th Cir.1999) (holding witness could testify as to threatening call from a co-conspirator because caller identified himself as "Ike" and "Ike" was the name of the person others told the witness she was working for, the witness was going to travel to see an "Ike", the witness testified that the voice was like no other male's voice in the conspiracy, and the government asserted there was only one "Ike" involved in the conspiracy).
Thus, in Dhinsa, it was not an abuse of discretion for a trial court to allow a witness to testify about two threatening calls made by defendant because the telephone calls were adequately authenticated based on "(1) the fact that the caller identified himself as the defendant; and (2) the need for Dhinsa to identify himself in order to receive the `benefit' of the threat." Dhinsa, 243 F.3d at 659.
New Jersey practice is in accord with these principles of authentication founded upon the distinctive substance or contents of a communication, or upon other contextual indicia that the sender or maker of the communication was indeed the person in question. For instance, in a criminal case alleging that the defendant had falsely reported a stolen car to his insurance company, the Appellate Division found sufficient for authentication purposes the testimony of an insurance agent attesting that he had received a telephone call from a person identifying himself as the defendant, and who displayed "intimate knowledge" of facts concerning the model, year and ownership of the subject vehicle, the date of its disappearance, and the insurance carrier. State v. Bassano, 67 N.J.Super. 526, 532-33, 171 A.2d 108 (App.Div.1961).
Similarly, in Robinson v. Branch Brook Manor Apts., 101 N.J.Super. 117, 121-22, 243 A.2d 284 (App.Div.1968), the court upheld *83 the admission, in a civil rights case against the landlord, of a telephone call from a landlord's agent to a white prospective tenant informing her of the availability of certain apartments that were not made available to a minority applicant. The telephone call was deemed competent proof, even though the recipient of the call did not know the landlord's agent personally and thus could not identify him positively, based on extrinsic proof that preceded and followed the call. As Robinson noted, "although traditionally authentication of a telephone conversation required the caller's identification of himself as X and the witness's affirmation that he was able to recognize the voice as that of X, the preferred rule now is that reliable circumstantial evidence of the identity of the caller as X will suffice." Id. at 121, 243 A.2d 284.
Having observed Dr. Vohra firsthand and considered his sworn version of the alleged conversations, the court is satisfied that there is, as Rule 901 prescribes, "evidence sufficient to support a finding" that defendant Lawrence Eisenberg was the person who placed the telephone calls at issue. Although Dr. Vohra candidly acknowledged that he was not certain whether he had spoken with defendant Lawrence Eisenberg, that acknowledgment is not fatal to plaintiff's position. The surrounding circumstances of the call, in the wake of Dr. Vohra's earlier advice that plaintiff should go back to Dr. Eisenberg to have the crown removed or repaired, coupled with Dr. Eisenberg's June 1998 letter to plaintiff confirming their own recent contact on that subject, lend credence to the authenticity of the identification. Further, the caller allegedly mentioned several details about plaintiff's situation that would not be matters of common knowledge, including the controversial socalled "open margins" spotted in plaintiff's mouth by Dr. Vohra; the uncommon first name and surname of the plaintiff; and the number of years of defendant's local practice.
In addition, the caller identified himself to Dr. Vohra as "Dr. Eisenberg." While it is theoretically possible that the call could have originated from one of the brothers of Dr. Lawrence Eisenberg, that possibility does not give the court pause. If, for the sake of argument, the call to Dr. Vohra had been from Adam or Matthew Eisenberg, the call nevertheless could be admitted against Lawrence Eisenberg pursuant to N.J.R.E. 803(b)(4) under agency principles, as a statement by one of the fellow members of the brothers' professional practice concerning matters within the scope of the practice's affairs.[3] The court need not and does not, however, rely on this rationale, for there is ample proof to support a finding that the caller was indeed Lawrence Eisenberg and not one of his brothers.
The court's determination in this regard is merely a finding of conditional relevancy. See N.J.R.E. 104(b). The jury ultimately may choose to believe or disbelieve Dr. Vohra=s sworn account of the alleged conversations, and to believe or disbelieve that the other person on the telephone line was the defendant. That is its prerogative. All that the court finds at this stage *84 is proof reasonably sufficient to support the conditions of authentication. In the final jury charge, the jury will be instructed, pursuant to Rule 104(b), that if it finds that the conditions of authentication are not met, it shall disregard the proof of the telephone conversations as irrelevant.
B. Hearsay Doctrine
If the jury does credit Dr. Vohra's account of the telephone conversations and conclude that the threatening statements at issue were in fact made by Lawrence Eisenberg, then the statements may be considered for their truth against Dr. Eisenberg under the party-opponent admissions doctrine codified at N.J.R.E. 803(b)(1). Simply stated, if the caller was indeed the defendant, then his out-of-court words may be used against him if they are relevant.
Moreover, there is a non-hearsay basis to admit the caller's utterances for reasons other than for the proof of what they asserted. See N.J.R.E. 801(c) (defining hearsay as only those out-of-court statements offered "to prove the truth of the matter asserted"). For instance, the alleged threatening statements to Dr. Vohra may be considered, even if they were objectively untrue and if the caller could never have made good on the threats, for the very fact that they were uttered. A threat is a verbal act, not excludable under the hearsay doctrine. See State v. McKiver, 199 N.J.Super. 542, 547-48, 489 A.2d 1256 (App.Div.1985)(admitting threats as non-hearsay verbal acts). Alternatively, the statements allegedly made over the phone by defendant might be offered for the non-hearsay purpose of impeaching his credibility if he, as expected, takes the stand in his own case. The court need not explore these alternative possibilities in detail here, since, as noted above, there is ample evidence to support a finding that the caller was in fact the defendant and thus his out-of-court utterances are fair game for his adversaries.
C. Rule 403 Balancing of Probative Value Versus Undue Prejudice
Defense counsel argues that even if the telephone conversations at issue could be properly authenticated and could conform to the hearsay rules, they still should be excluded under N.J.R.E. 403. Defendant specifically invokes the language of Rule 403 that provides that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of...undue prejudice." Id. (emphasis added).
The admissibility of proof under the factors of Rule 403 is a matter committed to the discretion of the trial court. State v. McDougald, 120 N.J. 523, 577-78, 577 A.2d 419 (1990). The rule sounds in the permissive, for it literally contemplates the court "may" exclude especially prejudicial proof, or it "may not." In performing the weighing process called for by Rule 403, the trial court's discretion "is a broad one." State v. Sands, 76 N.J. 127, 144, 386 A.2d 378 (1978).
Here, the court finds the alleged telephone conversations reported by Dr. Vohra if they did indeed occur and if indeed the defendant placed those calls have considerable evidential weight. If the defendant was attempting to intimidate Dr. Vohra, and, indirectly, the plaintiff, from pursuing corrective action with other professionals, such conduct amounts to impermissible retaliatory behavior. One reasonable "spin" on the alleged conversation was that the defendant was seeking to scare Dr. Vohra from criticizing Dr. Eisenberg's work, and to likewise scare the plaintiff from taking medical or legal recourse for her condition. A more benign *85 interpretation, of course, might be that Dr. Eisenberg was understandably upset that his work had been criticized by a fellow dentist and by a former patient, and that he was conveying his natural feelings of agitation in the heat of the moment. These assessments of credibility and candor are well within the province of the factfinder.
Accordingly, the court concludes that the probative value of this evidence in providing insight on the credibility of the defendant and concerning his overall treatment of plaintiff after the crown was installed is not substantially outweighed by any undue prejudicial effects.
So Ordered.
NOTES
[1] Before the opening statements at trial the court dismissed Doctors Adam and Matthew Eisenberg as named defendants in the action, there being no evidence proffered that either of those other two dentists had ever treated plaintiff in an improper manner or had ever directly supervised or controlled their brother Dr. Lawrence Eisenberg's treatment of her. See N.J.S.A. 14A:17-8 (imposing personal liability for tortious conduct upon the principals of a professional corporation only in situations where a principal had personally engaged in the pertinent negligent or wrongful acts or misconduct, or where the tortious conduct had been committed by a person under "his direct supervision and control"). Dr. Lawrence Eisenberg had fabricated and installed the crown at issue in this suit; plaintiff does not claim that the root canal treatment was in any way faulty. Further, the complaint did not name the Eisenberg brothers' professional corporation as a party defendant. Thus, the sole defendant at trial is Dr. Lawrence Eisenberg.
[2] "By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule...

(6) Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called, or (B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone." Fed.R.Evid. 901(b)(6).
[3] The standards of agency recited in N.J.R.E. 803(b)(4) for the admission of hearsay proof are quite different than those of vicarious liability under the statutory scheme for professional corporations. Specifically, the court's earlier finding that there is no proof that either Adam or Matthew Eisenberg "directly supervised" Lawrence Eisenberg for purposes of triggering personal liability under N.J.S.A. 14A:17-8, see footnote 1, supra, does not logically preclude the court from finding, in the context of the hearsay doctrine, that the brothers acted as agents for one another within the family business.