23-6561(L)
*United States v. Adamu*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2024
Argued: February 6, 2025
Decided: July 21, 2025

Nos. 23-6561 (Lead), 23-6696 (Con)

_____

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

GODOFREDO LEANDRO GONZALEZ, LUIS RAFAEL FEBRES MONASTERIO, MURVIN REIGOUD MAIKEL, OMAR TORRES, MOSES ROOPWAH, NEREDIO-JULIAN SUCRE, DAVID CARDONA-CARDONA,  ARGEMIRO ZAPATA-CASTRO, SHERVINGTON LOVELL, STEVEN ANTONIUS, YOUSSOUF FOFANA

*Defendants,*

JIBRIL ADAMU, JEAN-CLAUDE OKONGO LANDJI,

*Defendants - Appellants.*

_____

Appeal from the United States District Court
for the Southern District of New York
No. 1:18-cr-601-9, Paul G. Gardephe, *Judge*

_____

Before:      PARKER, BIANCO, and NARDINI, *Circuit Judges*.

Defendants-Appellants Jibril Adamu and Jean-Claude Okongo Landji appeal from a judgment of the United States District Court for the Southern District of New York (Gardephe, *J.*). They were convicted following a jury trial of conspiracy to distribute and to possess with the intent to distribute five kilograms or more of cocaine in violation of Title 21, U.S. Code, Sections 959(c), 959(d), and 963. On appeal, the Defendants contend that (1) the government lacked jurisdiction to prosecute under 21 U.S.C. § 959, (2) the government violated their Sixth Amendment right to counsel by improperly using privileged information at trial, and (3) the district court erred in permitting the government to introduce data extractions from their cell phones. For the reasons set forth, we **AFFIRM** the judgment of the district court.

FOR APPELLEE: ELINOR L. TARLOW, Assistant United States Attorney (Matthew J.C. Hellman, Nathan Rehn, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY.

FOR DEFENDANT-APPELLANT JIBRIL ADAMU: MICHAEL P. ROBOTTI, Ballard Spahr LLP, New York, NY (Kelly Lin, Kathryn, J. Boyle, Ballard Spahr LLP, New York, NY, *on the brief*).

FOR DEFENDANT-APPELLANT JEAN-CLAUDE OKONGO LANDJI: JONATHAN I. EDELSTEIN, Edelstein & Grossman, New York, NY.

BARRINGTON D. PARKER, *Circuit Judge*:

Defendants-Appellants Jibril Adamu and Jean-Claude Okongo Landji appeal from a judgement of the United States District Court for the Southern District of New York (Gardephe, *J.*). Following a jury trial, they were convicted on one count of conspiracy to distribute and to possess with the intent to distribute five or more kilograms of cocaine. *See* 21 U.S.C. §§ 959(c), 959(d), 963. They were each sentenced to 120 months' imprisonment and five years' supervised release.

On appeal, the Appellants contend that (1) the government lacked jurisdiction to prosecute under 21 U.S.C. § 959, (2) the government violated the Sixth Amendment by improperly using information protected by the attorney-client privilege and (3) the district court erred in permitting the government to introduce data extracted from their cell phones. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

This case arises from a multi-year international narcotics trafficking conspiracy in which Landji and Adamu used a private aircraft to transport multi-ton shipments of cocaine from South America to Africa and Europe. Landji is a United States citizen who owned and operated an aviation charter business using

a Gulfstream G2 jet, and Adamu was Landji's co-pilot in the operation that led to their ultimate arrest.

In 2016, Landji began planning a large-scale drug trafficking operation with his co-conspirator, David Cardona-Cardona ("Cardona"), a known cocaine trafficker. Cardona, who testified at trial pursuant to a cooperation agreement, introduced Landji to Adamu. Landji and Adamu undertook extensive preparations to conceal and facilitate their operation, which included retrofitting the G2, conducting test flights, scouting remote landing strips in Western Sahara, and communicating over secure messaging platforms.

In May 2018, Landji met with three individuals: Cardona, Youssouf Fofana, one of Cardona's drug customers, and a confidential DEA informant known as "Rambo" who posed as a large-scale trafficker. During a series of meetings in Lomé, Togo, which were covertly recorded and admitted at trial, the conspirators discussed the logistics of the trafficking plans. The defendants planned to use the G2 to make "black flights" (i.e., flights with disabled transponders) to transport multi-ton cocaine shipments by co-mingling narcotics with legitimate cargo. Landji agreed to a one-kilogram test run to demonstrate the conspirators' capacity to move larger quantities of drugs.

4

In October 2018, the defendants finalized their plans for the test flight. They loaded the G2 with a kilogram of cocaine in Mali and flew it to Zagreb, Croatia. When they arrived, Croatian authorities arrested both defendants. Along with the cocaine, the agents seized the defendants' mobile phones, which contained messages, videos, and contacts relating to their involvement in the drug conspiracy. Following the arrests, Adamu made admissions to DEA agents in which he acknowledged, among other things, his relationship with Cardona and his awareness that Cardona had previously used aircraft for drug smuggling.

Both defendants were extradited to the United States in October 2019. During the extradition process, DEA agents accompanying the defendants took custody of two categories of materials: documents collected by Croatian police (the "Croatian Law Enforcement Materials") and a separate set of personal papers found in the defendants' luggage (the "Extradition Documents"). The Croatian Law Enforcement Materials were produced to defense counsel in December 2019. However, the Extradition Documents were not produced at that time because of what government agents described as an internal misunderstanding. *See United States v. Landji*, No. (S1) 18-CR-601 (PGG), 2021 WL 5402288, at *18 (S.D.N.Y. Nov. 18, 2021). According to the lead prosecutor, the government "mistakenly

5

believed" that the Extradition Documents were duplicative scans of documents contained within the Croatian Law Enforcement Materials, and, for this reason, did not review or turn them over with their initial production. *Id.* However, after Adamu's counsel inquired in January 2020 about additional materials seized in Croatia, the government discovered the oversight. At that point, realizing that the Extradition Documents might contain potentially privileged information, the lead prosecutor in charge instructed the investigative team not to review them and directed a paralegal outside the team to produce them to defense counsel, which occurred in January 2020.

In October 2020, both defendants moved for the return of the Extradition Documents contending that they contained privileged attorney-client communications such as handwritten notes and legal memoranda. Defendants did not submit sworn declarations in support of their motions. The government opposed the motions and submitted sworn statements from DEA agents and prosecutors affirming that none of the materials had been read, apart from incidental exposure during their seizure and scanning. The district court, finding the defendants had not demonstrated the documents were privileged, denied the motion.

The issue resurfaced in July 2021 when Landji's counsel requested to inspect the original physical documents and discovered that some had not been included in the earlier production. One such document was a one-page memorandum from Landji's Croatian attorney ("the Šušnjar Memorandum"), which defense counsel argued contained privileged information including an outline of the defendants' legal strategy. At that point, both defendants renewed their motions for the return of the documents and sought a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), on the grounds that the government had seen and used privileged information. In support of the renewed motion, Landji submitted a declaration stating he had made handwritten notes on certain documents in preparation for discussions with his attorney. Adamu's motion referred to a notebook containing some 100 pages of notes that allegedly were made in anticipation of meetings with counsel.

The district court held a *Kastigar* hearing in September and October 2021 and ultimately denied the motion. The government presented six witnesses—four DEA agents, a DEA analyst, and the lead prosecutor. The district court found that they each had credibly testified that they had neither read nor relied upon the Extradition Documents at any stage of the investigation or prosecution, and that

none of the government's investigatory steps or legal strategies were based on those Documents. The district court also determined that the only privileged document was the Šušnjar Memorandum, but that it had never been reviewed by the government. The district court further concluded that, even assuming some inadvertent exposure had occurred, it did not taint the government's case because it had been developed through independent sources such as proffers from a cooperating witness and third-party interviews. The district court also ruled, in the alternative, that any indirect or tangential awareness of privileged material would not rise to the level of a *Kastigar* violation.

At trial, the government introduced extensive evidence, including testimony from Croatian law enforcement, Cardona's testimony as a cooperating witness, covert recordings of the May 2018 meetings, electronic communications between the defendants and their co-conspirators, as well as photographs of the seized drugs. The jury convicted both defendants. This appeal followed.

On appeal, Defendants argue that (1) the government lacked jurisdiction to prosecute their offenses under 21 U.S.C. § 959, (2) the government violated their right to counsel by improperly using privileged information in its prosecution, and (3) the district court erred in permitting the government to introduce data

extractions from the defendants' cell phones. For the reasons set forth below, we affirm the judgment of the district court.

## DISCUSSION

### I. Jurisdiction

Defendants first argue that the United States lacks jurisdiction because 21 U.S.C. § 959 does not criminalize extraterritorial acts of possession with intent to distribute—the offense for which defendants were convicted. *See* 21 U.S.C. § 959(c). But, as the district court correctly concluded, we have already held that 21 U.S.C. § 959 "appl[ies] extraterritorially in its entirety," including to "acts of possession with intent to distribute." *United States v. Epskamp*, 832 F.3d 154, 162–66 (2d Cir. 2016).

Defendants nevertheless contend that *Epskamp* was wrongly decided and ask that we revisit that decision. Relying on the D.C. Circuit's decision in *United States v. Oral George Thompson*, they argue that because 21 U.S.C. § 959 gives no "clear indication" of an extraterritorial application for possession with intent to distribute, we must conclude that it has none. 921 F.3d 263, 268 (D.C. Cir. 2019). But *Epskamp* controls and we see no reason to disregard it for out-of-Circuit precedent. In any event, it is well settled that one panel of this Court cannot

9

overrule a prior decision of another panel. *See, e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022). Accordingly, we conclude that the government had jurisdiction under § 959.

## II. Right to Assistance of Counsel

Next, defendants contend that the prosecution violated the Sixth Amendment by improperly using privileged documents, and that the district court thus erred in denying their *Kastigar* motion. First, defendants argue that the district court erred in concluding that none of the Croation Law Enforcement Documents were privileged and that only one of the Extradition Documents—the Šušnjar Memorandum—fell within the privilege. Second, defendants contest the district court's factual determination that the government did not use the Memorandum in its prosecution. We reject both contentions and conclude that the district properly denied the *Kastigar* motions.

To establish a Sixth Amendment violation arising from an invasion of the attorney-client privilege, a defendant must prove (1) that privileged information was passed to the government or that the government intentionally invaded the attorney-client relationship, and (2) that he was prejudiced as a result. *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985). To satisfy this test, a defendant

10

must first make a threshold showing that the information is privileged and that the government actually reviewed it. *United States v. Schwimmer*, 924 F.2d 443, 445 (2d Cir. 1991). If the defendant establishes that the government reviewed privileged information, it is not in all instances barred from using the information. However, the government must prove that the evidence it proposes to use is derived from a legitimate source "wholly independent" of the privileged information. *See Kastigar*, 406 U.S. at 460; *see also United States v. Nanni*, 59 F.3d 1425, 1432 (2d Cir. 1995). But even if the government used privileged information, a defendant is still required to show that the government's conduct was "manifestly and avowedly corrupt" or that there was "prejudice to [the defendant's] case resulting from the intentional invasion of the attorney-client privilege." *Schwimmer*, 924 F.2d at 447.

### A. Privileged Material

The District Court correctly concluded that none of the Extradition Documents except the Šušnjar Memorandum contained privileged information. These non-privileged documents are a combination of (1) court documents, highlighted, underlined, or otherwise marked by the defendants, (2) handwritten notes by defendants, and (3) emails. The district court determined that neither the

court documents nor the notes were privileged because there was no "proof that [their contents] were discussed with a lawyer or intended to serve as an outline of what would be discussed with a lawyer." *See Landji*, 2021 WL 5402288, at *17.

We agree. The Supreme Court has explained that because the privilege has the effect of withholding relevant information from the factfinder, "it applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976). Accordingly, in *United States v. DeFonte*, we reasoned that "[a] rule that recognizes a privilege for ***any*** writing made with an eye toward legal representation would be too broad." 441 F.3d 92, 96 (2d Cir. 2006) (emphasis added). Instead, we look to whether the allegedly privileged information has actually been communicated to counsel. *Id.* at 95. This is because "there can be no violation of the [S]ixth [A]mendment without some communication of valuable information." *Ginsberg*, 758 F.2d at 833. So, while "delivery of the [notes to one's attorney] is not necessary" for the privilege to attach, defendants had to demonstrate that the content of the notes was communicated by the client to the attorney. *DeFonte*, 441 F.3d at 96. The district court found that the defendants failed to make this showing. *See Landji*, 2021 WL 5402288, at *17.

12

On appeal, the defendants challenge this finding and assert that they did in fact share the content of the Extradition Documents with their attorneys. But this determination is a factual one "that will not be reversed unless the district court's finding is clearly erroneous." *Schwimmer*, 924 F.2d at 446. Here, defendants point to no testimony or anything else in the record to support this argument. While the defendants claim that they notified their counsel of the *seizure* of the Extradition Documents, tellingly, they do not claim that they ever discussed the *content* of the documents with their attorneys. Thus, the district court correctly concluded that the notes did not fall within the attorney-client privilege.

## B. Government Review of Documents

The parties concede that one document—the Šušnjar Memorandum—was privileged. The district court concluded that the government did not review the document. *See Landji*, 2021 WL 5402288, at *23–25. The defendants challenge this factual determination, contending that because there were times that the prosecution team had access to the Extradition Documents, the government must have reviewed the Šušnjar Memorandum. This factual conclusion "will not be reversed unless [it] is clearly erroneous." *Schwimmer*, 924 F.2d at 446.

We discern no error, clear or otherwise. The evidence presented during the *Kastigar* hearings included the testimony of six government witnesses, each of whom testified that they did not read the substance of the Extradition Documents. Further, the lead prosecutor testified that he warned a member of the investigative team not to review the Extradition Documents because they might contain privileged documents. *See Landji*, 2021 WL 5402288, at *25. Based on this record, the district court concluded that the government did not invade the privilege. On appeal, the defendants offer no non-speculative reasons to disturb those findings and, consequently, we conclude that the district court committed no error.

## C. Wholly Independent Sources

Even assuming *arguendo* that the government reviewed the Šušnjar Memorandum, we discern no error, clear or otherwise, in the district court's determination that the government derived its evidence from independent sources. Where the government reviews privileged documents, "[t]he government must demonstrate that the evidence it uses to prosecute an individual was derived from legitimate, independent sources." *Schwimmer*, 924 F.2d at 446 (citing *Kastigar*, 406 U.S. at 461–62).

The government initially claimed, based on information from Croatian law enforcement that the G2's transponders had been turned off for at least part of the flight, that the test shipment was a "black flight." *Landji*, 2021 WL 5402288, at *22. Prior to trial, however, the government dropped its black-flight theory. The government asserts that this change was solely based on information provided by Cardona, the government's cooperating witness, and Curtis Seal, the third occupant of the airplane. Defendants, on the other hand, assert that the change was based on information the government learned through its review of the Extradition Documents. Defendants contend that "the government articulated *no* independent justification for its decision to question witnesses about the black-flight theory." Adamu's Opening Br. at 47. In other words, defendants contend that even if the government dropped the black-flight theory because of information it learned from Cardona and Seal, the decision to question them on the theory was a result of the government's review of the Šušnjar Memorandum.

The record does not support this contention. It shows that Cardona was involved in coordinating the logistics of the G2 test shipment, that he had attempted black-flight drug shipments on prior occasions, and that he had discussed black flight shipments with the defendants. The record is also clear that

15

"Curtis Seal was [] on the plane" when the arrests occurred. *Landji*, 2021 WL 5402288, at \*25. It was therefore obvious that the government would question these witnesses on its black-flight theory, irrespective of the contents of the Extradition Documents and the Šušnjar Memorandum. Accordingly, the district court did not err, let alone commit clear error.

### D. Prejudice

Finally, we agree with the government that any potential error stemming from the district court's finding of no invasion, intentional or otherwise, of the attorney-client privilege in this case was harmless. To find an error harmless, "we must be able to conclude that the evidence would have been unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *United States v. James*, 712 F.3d 79, 99–100 (2d Cir. 2013) (quotation marks and citations omitted). When making that determination "we principally consider: (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted evidence; and (4) whether such evidence was cumulative of other properly admitted evidence." *United States v. McCallum*, 584 F.3d 471, 478 (2d Cir. 2009) (alteration and quotation marks omitted). Our Court has

16

"repeatedly held that the strength of the government's case is the most critical factor in assessing whether error was harmless." *Id.*

Here, the government presented overwhelming direct evidence of the defendants' guilt. Both defendants were arrested in the act of flying cocaine into Croatia. At trial, Cardona testified in detail about the seized shipment, defendants' prior drug dealings, and their involvement in the conspiracy. The government's evidence also came from extensive video and audio recordings of meetings in which Landji discussed cocaine trafficking with Cardona, and which contained multiple references to Adamu's role in the conspiracy scheme, as well as intercepted calls and text messages between Cardona and Fofana in which they discussed Landji and Adamu's participation in the conspiracy. In light of this extensive evidence of guilt, the discrete question of whether the Šušnjar Memorandum, if reviewed by law enforcement agents, caused the government to question witnesses about its initial black-flight theory was inconsequential such that we "can conclude with fair assurance that the [challenged] evidence did not substantially influence the jury." *McCallum*, 584 F.3d at 478 (quotation marks omitted).

## III. Cellebrite Cellphone Extractions

Next, defendants argue that the district court erred in admitting cell phone data extracted in Croatia, and further erred in admitting the testimony of analyst Enrique Santos, who interpreted the data and explained the process by which it was extracted. Defendants point out that the government did not call Ante Bakmaz, the Croatian technician who performed the extraction.

First, Landji argues that Santos's testimony could not properly authenticate the extracted data as required by Fed. R. Evid. 901 because he did not perform the extraction. Second, Defendants contend that admission of Santos' testimony violated the Confrontation Clause. *See* U.S. Const. amend. VI. ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."). We disagree.

### A. Authentication of Cellebrite Extraction

Evidentiary rulings are generally reviewed for abuse of discretion. *See United States v. LaFlam*, 369 F.3d 153, 155 (2d Cir. 2004). Rule 901 provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Rule 901 "does not erect

18

a particularly high hurdle," and that hurdle may be cleared by "circumstantial evidence." *United States v. Dhinsa*, 243 F.3d 635, 658–59 (2d Cir. 2001). Further, the proponent is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be." *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999). Rule 901 is satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Id.* Indeed, a document may be authenticated by distinctive characteristics of the document itself, such as its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed R. Evid. 901(b)(4); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990). Finally, as we explained in *SCS Communications, Inc. v. The Herrick Co.*, 360 F.3d 329, 344–45 (2d Cir. 2004), the opposing party remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight, not the admissibility, of the evidence.

The government proved that the cell phones were owned by the defendants: indeed, they admitted ownership. At trial, the government introduced evidence

19

from WhatsApp messages involving Landji, Adamu, and Fofana that included profile photographs, account usernames, and phone numbers associated with these messages. Santos also testified that the International Mobile Equipment Identity (IMEI) numbers, a unique numeric identifier found on cellphones, linked to the defendants' cell phones and matched the IMEI numbers found on the extraction report. Finally, Santos testified that the size of the forensic images of the physical cellphones matched the size of the data contained in the extraction reports, which provided additional confirmation that the data in the reports came from the defendants' cell phones. *See* App'x 1189–90. This testimony was enough to satisfy Rule 901.

Landji's arguments against admissibility are unpersuasive. First, he urges that Santos could not properly authenticate the cellphone extractions because Santos was not a "witness with knowledge" within the meaning of Rule 901(b), as he was not present when the Cellebrite data was extracted and could not testify as to its chain of custody. But "[b]reaks in the chain of custody do not bear upon the admissibility of evidence, only the weight of the evidence." *United States v. Morrison*, 153 F.3d 34, 57 (2d Cir. 1998).

Next, Landji contends that Santos' testimony "did not account for non-manipulation-related defects in the data such as machine error, software glitches, operator error, and/or omission." Landji Opening Br. at 50. Though these arguments may be fertile ground for cross-examination, they too bear on the weight of the evidence, not its admissibility. *See SCS Commc'ns, Inc.*, 360 F.3d at 344–45 (noting that challenges to reliability of evidence go to the weight of the evidence). For these reasons, we conclude that the district court correctly determined that the reports were sufficiently authenticated under Rule 901.

## B. Confrontation Clause

Defendants also argue that the admission of the cell phone extractions violated the Sixth Amendment's Confrontation Clause. Specifically, they contend that, under the Clause, they were entitled to cross-examine the Croatian technician who conducted the extractions. In support of this contention, they primarily rely on *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), both of which involved efforts to substitute certification or affidavits for live testimony regarding the results of a laboratory or forensic examination. We review *de novo* evidentiary rulings that allege violations of the Confrontation Clause. *United States v. Vitale*, 459 F.3d 190, 195 (2d Cir. 2006).

The Confrontation Clause bars admission of "testimonial statements" in a criminal case where the defendant does not have the opportunity to cross-examine the author of those statements. *See Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). In *Smith v. Arizona*, the Supreme Court explained that "[t]o implicate the Confrontation Clause, a statement must be hearsay ('for the truth') and it must be testimonial—and those two issues are separate from each other." 602 U.S. 779, 800 (2024). *Smith* dealt exclusively with the first point: whether a non-testifying drug lab analyst's report, which was relied upon by a testifying lab analyst, was submitted for the truth. However, the Supreme Court expressly declined to resolve what makes a statement "testimonial." *Id.* at 801.

We need not opine on what makes a statement testimonial because the cellphone extraction reports were not "statements" in the first place. Rather, they are raw, machine-created data. Unlike the certifications or affidavits in *Melendez-Diaz* and *Bullcoming*, the Cellebrite extraction reports do not contain attestations or certifications by the Croatian analyst who ran the Cellebrite program because they do not contain anything that can be characterized as an implicit or explicit declarative statement by the examiner. That is because the Croatian examiner who is listed on the report did not actually write it. Rather, the entire report was

22

generated through an automated process within the Cellebrite program. *See* App'x 1334-41. We conclude that because the raw cellphone extraction reports contained "only machine-generated results," they were not the statements of anyone. *Bullcoming*, 564 U.S. at 673 (Sotomayor, J., concurring in part).

But even if the cellphone extractions were admitted in error, "a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Vitale*, 459 F.3d at 195 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). We agree with the district court that any error in admitting this evidence would be harmless, because the contents of the phones constituted only a small fraction of the government's evidence of Landji and Adamu's involvement in the drug conspiracy.

We have been clear that "[t]he strength of the prosecution's case . . . is probably the single most critical factor" in harmless-error analysis. *United States v Lee*, 549 F.3d 84, 90 (2d Cir. 2008) (internal quotation marks and citation omitted). The district court concluded here that it "view[ed] the [cellphone extraction] evidence as quite marginal in terms of its significance to the jury," and "believe[d] the case [would] turn on the jury's estimate of Mr. Cardona's credibility." App'x 1332. We agree. Although the cellphone extraction evidence was relevant, it

23

consisted largely of coded discussions that did not explicitly refer to criminal activity, and the incriminating photographs and videos of airstrips and the airplane were cumulative of Cardona's testimony.

By contrast, the prosecution brought forth a great deal of other evidence that both corroborated Cardona's testimony and directly proved the defendants' guilt. This evidence included extensive undercover recordings of Landji's meetings with Cardona and Rambo, during which Landji participated in planning both his and Adamu's participation in the conspiracy. It also included recordings of calls between Cardona and Fofana in which they acknowledged Landji and Adamu's plan to bring the test shipment of cocaine onto their G2. The jury also heard testimony that Adamu admitted, after his arrest, that he knew Cardona and was aware that Cardona used planes to engage in drug smuggling. *See United States v. Jean-Claude*, No. (S1) 18-CR-601 (PGG), 2022 WL 2334509, at *8 (S.D.N.Y. June 27, 2022). Finally, there was evidence that Croatian law enforcement officers recovered cocaine from the G2. Therefore, when compared to the extensive evidence already supporting the jury's verdict, we conclude that the admission of the additional materials obtained from the cellphones, even if erroneous, did not substantially influence the jury's guilty verdict.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.